UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Crim. No. 16-cr-75 (MJD/LIB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Derrick Angelo Harper, | |
| Defendant. | |

---

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon Defendant Derrick Angelo Harper's ("Defendant") Motion to Suppress Statements, [Docket No. 23]; and Motion to Suppress Search and Seizure, [Docket No. 24]. The Court held an evidentiary hearing on May 10, 2016, regarding these pretrial motions.

Following the motions hearing, the parties requested the opportunity to submit supplemental briefing which was completed on May 25, 2016, and Defendant's Motion to Suppress Statements, [Docket No. 23]; and Motion to Suppress Search and Seizure, [Docket No. 24], were then taken under advisement by the undersigned on May 25, 2016.

For the reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Statements, [Docket No. 23], be **GRANTED in part** and **DENIED in part**. The Court also recommends that Defendant's Motion to Suppress Search and Seizure, [Docket No. 24], be **DENIED** as moot.

I.  **BACKGROUND AND STATEMENT OF FACTS**

   A. **Background**

On March 22, 2016, Defendant Derrick Angelo Harper ("Defendant") was indicted with one count of bank robbery in violation of 18 U.S.C. §§ 981(a)(1)(C), 2113(a), and 2461(c). (Indictment, [Docket No. 8]).

**B. Facts[1]**

At approximately 1:08 p.m., on January 25, 2016, the Duluth Police Department received a report that the Park State Bank in Duluth, Minnesota, had been robbed. (Tr. 10). Duluth Police Department Violent Crimes Investigator Michael Tinsley ("Investigator Tinsley") was one of the officers who responded to the report. (Tr. 10-11). Investigator Tinsley interviewed a bank teller at the scene to whom the robber had spoken during the robbery. (Tr. 11). The teller described the robber to Investigator Tinsley as a black male, in his thirties, and approximately six feet tall with a slender build. (Tr. 11). The teller also told Investigator Tinsley that the robber had been wearing a gray or off-colored fleece jacket or sweatshirt, as well as, a gray knit cap. (Tr. 11).

The Park State Bank also had video surveillance of the robbery. (Tr. 12). Investigating officers were able to retrieve still images from the video surveillance footage. (Tr. 13). The Duluth Police Department put the images into a press release by which the Duluth Police Department asked the public for assistance in identifying the robber. (Tr. 13).

During the evening of January 26, 2016, Investigator Tinsley received a call on the Duluth Police Department's Violent Crimes Unit line. (Tr. 14). The caller indicated that they wished to remain anonymous. (Tr. 14).[2] The anonymous caller identified Defendant Derrick Harper by name to Investigator Tinsley as the person who had appeared in the still images

---

[1] Except where expressly stated otherwise, the statement of facts is drawn from the testimony of Duluth Police Department Investigator Michael Tinsley at the May 10, 2016, motions hearing. Citations are to the transcript of the May 10, 2016, motions hearing. [Docket No. 33]. Throughout this report and recommendation, the Court refers to the transcript of the May 10, 2016, motions hearing by the abbreviation "Tr."

[2] However, Investigator Tinsley knows the identity of the caller. (Tr. 43).

included in the Police Department's press release. (Tr. 14). The caller also told Investigator Tinsley that Defendant was at that time residing at the Duluth Bethel Port Rehabilitation Center ("Bethel"), located at 23 Mesaba Avenue, in Duluth Minnesota[3], and that Defendant was working at Customer Link at the Tech Village, which Investigator Tinsley knew was located at 11 East Superior Street in Duluth. (Tr. 14). The anonymous caller also told Investigator Tinsley that Defendant had been involved in a previous bank robbery in 2005. (Tr. 14).

After receiving the call, Investigator Tinsley took steps to verify the information provided by the anonymous caller. (Tr. 15). Investigator Tinsley consulted a database containing the Minnesota repository of arrest photos. (Tr. 15). He found Defendant's arrest photo in the database and compared it to one of the still images taken from the Park State Bank surveillance footage. (Tr. 14). To Investigator Tinsley, Defendant's prior arrest photo appeared to be a match for the image of the robber appearing in the Bank's surveillance footage. (Tr. 15). Using another police database, Investigator Tinsley also confirmed that Defendant had been documented as having been involved in a previous bank robbery in 2005. (Tr. 15).

Investigator Tinsley also went to the Bethel facility where he confirmed that there was an individual named Derrick Harper residing at that location. (Tr. 15, 43). Finally, Investigator Tinsley went to the Customer Link offices in Duluth and he confirmed that Defendant was employed there. (Tr. 15).

---

[3] At the motions hearing, Investigator Tinsley testified that the anonymous caller had told him that Defendant was residing at "Bethel," which he knows is located at 23 Mesaba Avenue. (Tr. 14). The Court takes judicial notice that the Duluth Bethel Port Rehabilitation Center is located at 23 Mesaba Avenue, in Duluth, Minnesota. See Federal Rule of Evidence 201(b) (a court may take judicial notice of a fact that is not subject to reasonable dispute and is generally known within the court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned); see also Haggins v. Ramsey Cty., No. CIV. 12-3147 (DWF/LIB), 2014 WL 772600, at *7 (D. Minn. Feb. 25, 2014) (taking judicial notice of the street address of a county law enforcement center).

Based on the anonymous caller's tip and his own subsequent investigation, by January 27, 2016, Investigator Tinsley had concluded that Defendant was the individual who had robbed the Park State Bank on January 25, 2016. (Tr. 16).

During the middle of the day on January 27, 2016, Investigator Tinsley contacted Defendant's employer, Customer Link, to confirm that Defendant was at that time presently at work. (Tr. 16, 26). Investigator Tinsley then assembled a team of five other officers for the purpose of arresting Defendant. (Tr. 16-17). The team of six officers total went to the Customer Link offices to arrest Defendant. (Tr. 17).

The Customer Link offices are located on the fourth floor of an office building. (Tr. 17). Customer Link maintains a lobby that has a door that opens into the office building's elevator area, and it has a second door secured by a keycard-based electronic lock that leads to the Customer Link call center where Defendant works. (Tr. 18, 31). The Customer Link call center is a single large room in which work cubicles have been set up for approximately forty (40) people. (Tr. 18).

Investigator Tinsley believed that it would safest to arrest Defendant by having a Customer Link manager summon Defendant from the call center area out in to the lobby area where the officers would be waiting. (Tr. 18). Investigator Tinsley had shared his plan to arrest Defendant with a Customer Link manager who, upon being notified by Investigator Tinsley that the officers had arrived in the Customer Link lobby area, summoned Defendant from the call center out in to the lobby area. (Tr. 19, 26-27).

When Defendant entered the Customer Link lobby area, the officers, who had taken positions at each of the doors in the lobby area[4], immediately arrested him and placed him in

---

[4] The lobby area also has two other doors that lead to areas that were not identified at the motions hearing. (See Tr. 27-28).

4

handcuffs. (Tr. 19, 30). The officers then conducted a pat search of Defendant's person for weapons. (Tr. 20). The officers did not find any weapons, but they did find Defendant's Customer Link employee key card which Investigator Tinsley seized. (Tr. 30-32). Investigator Tinsley showed Defendant the key card, and he told Defendant that he was going to go gather Defendant's personal belongings from his work space. (Tr. 33-34). The other officers then took Defendant to one of the officer's squad cars to be transported to the Duluth Police Department headquarters. (Tr. 20).

While Defendant was being transported to the Duluth Police Department headquarters, Investigator Tinsley, accompanied by a Customer Link manager who directed Investigator Tinsley to Defendant's work space in the call center, went to retrieve Defendant's personal items. (Tr. 20-21). From the surface of Defendant's desk in the call center, Investigator Tinsley collected Defendant's backpack, cellular phone, cap, and a charging cord. (Tr. 21, 36). He returned Defendant's employee key card to the Customer Link manager, and Investigator Tinsley then returned to the Duluth Police headquarters. (Tr. 22, 35).

At the Duluth Police headquarters, Investigator Tinsley interviewed Defendant about the January 25, 2016, robbery. (Tr. 22-25, 41). The interview did not, however, begin immediately. (See Tr. 22-23). Rather, Investigator Tinsley, still armed and wearing his tactical vest from the arrest, placed Defendant into a small, windowless interview room to wait for the interview to begin. (Tr. 23, 37-38, 40). The room contained a small rectangular table with two chairs facing each other from opposite sides of the table, a telephone mounted on the wall, and a small garbage can. (Tr. 38).

A video recording was made which began at the time that Defendant was placed in the interview room. (See, gen., Govt. Ex. 2). At that point, Defendant told Investigator Tinsley that

his handcuffs were too tight. (Tr. 23). Investigator Tinsley checked the handcuffs, and he concluded that they were properly spaced. (Tr. 23). He then told Defendant to take a seat, and he left the interview room telling Defendant that he would be back shortly. (Tr. 23).

Investigator Tinsley then went to his desk to take off his tactical vest and pick up his case file; thereafter he returned to the interview room. (Tr. 23). Upon his return to the interview room approximately five (5) minutes later, Investigator Tinsley conducted a second pat search of Defendant, and he collected items from Defendant's pockets. (Tr. 23, Gov't. Ex. 2 at 5:09-8:20). A second officer, Duluth Police Department Investigator Temple joined the interview at about that time; Investigator Temple brought with him a third chair he used to sit on the same side of the table as Investigator Tinsley. (Tr. 24, 39, Govt. Ex. 2 at 5:33). Both Investigator Tinsley and Investigator Temple remained armed during the interview, but neither of them brandished their weapons. (See, gen., Gov't. Ex. 2). After the second pat search of Defendant had been conducted, the Investigators removed Defendant's handcuffs. (Govt. Ex. 2 at 8:40).

Investigator Tinsley then began the interview by asking Defendant to confirm his identity and current address; which Defendant did. (Govt. Ex. 2 at 9:20-9:40). Investigator Tinsley then asked Defendant to provide physical information about himself, which Defendant did. (Govt. Ex. 2 at 9:45-10:15). Investigator Tinsley then asked Defendant to provide his phone number, which Defendant also did. (Govt. Ex. 2 at 10:15-10:50).

Investigator Tinsley then read Defendant the Miranda warnings. (Govt. Ex. 2 at 10:55-11:12). Investigator Tinsley did not provide Defendant with a written version of the warnings to allow Defendant to follow along, nor did he pause after reading each individual warning to ask Defendant whether Defendant had understood the warning. (See Govt. Ex. 2 at 10:55-11:10).

6

After Investigator Tinsley read Defendant complete <u>Miranda</u> warnings, the following exchange occurred:

Tinsley: Do you understand each of the rights that I have explained to you?

Defendant: I understand them real well.

Tinsley: Having these rights in mind, will you speak with me now?

Defendant: I'll speak to you [inaudible] I … I haven't done anything so I don't mind. [Inaudible] and so.

Tinsley: Okay. I . . . I got to, just so we're clear, is that a "yes" or a "no" sir?

Defendant: Yeah. I'll speak with you.

(Govt. Ex. 2 at 11:10-11:27).

The Investigators then began asking Defendant questions about himself, his activities, and the January 25, 2016, robbery; which Defendant answered. (<u>See</u> Govt. Ex. 2 at 11:30-1:09:50). Approximately one hour after the interview began, the following exchange occurred:

Tinsley: So everything you're trying to tell us…

Defendant: You all got somebody sayin' stuff and everything well yeah that guy looks like that, and that's him. I think it's him. You can put them up on the stand. They lyin'. I don't know nothing about that. I ain't got nothing to do with that, man. You know what I'm sayin'? And that's it, man. And I ain't got…

Tinsley: Derrick…

Defendant: Look man, we done, man. [Inaudible].

Tinsley: Everything… Let me… I'm going to just make one final statement to you.

Defendant: [Inaudible]

Tinsley: Everything you're trying to tell me to verify your story…

Defendant: Yup. We done, man. I ain't got nothing else to say, man. [Inaudible].

Tinsley: Everything you're trying to tell me. . .

7

Defendant:   Get me a lawyer, whatever. That's what I'm saying from here on out. So we can quit playing games. Simple as that.

(Govt. Ex. 2 at 1:09:51-1:10:30). Following the exchange, the Investigators terminated the interrogation. (Govt. Ex. 2 at 1:10:30).

Investigator Tinsley placed Defendant back in handcuffs. (Govt. Ex. 2 at 1:10:35). Although the Investigators did not ask any additional questions at that point, Defendant made a short series of additional statements. (Govt. Ex. 2 at 1:11:07-1:11:40). Investigator Tinsley left the interview room to prepare transportation documents while Investigator Temple remained in the interview room with Defendant. (Govt. Ex. 2 at 1:12:28).

Shortly after Investigator Tinsley left the interview room, Investigator Temple showed Defendant an information sheet in Investigator Temple's possession that contained a photograph of Defendant and asked Defendant: "That was a while ago, hunh?" (Govt. Ex. 2 at 1:12:47). Defendant responded, "Yup." After that, neither of the Investigators asked Defendant any questions and Defendant was eventually moved from the interview room. (See Govt. Ex. 2 1:13:11-1:31:30).

On January 29, 2016, Investigator Tinsley prepared an application for and obtained a state court warrant authoring a search of the contents of Defendant's cellular phone and any attached storage media. (Govt.'s Ex. 1, 1). The warrant for the search of the contents of Defendant's phone was the only warrant that the officers applied for in the present case (Tr. 35).

## II.   DEFENDANT'S MOTION TO SUPPRESS STATEMENTS. [Docket No. 23].

Defendant moves the Court to suppress any statements he made on January 27, 2016. (Def.'s Motion to Suppress Statements, [Docket No. 23]).

### A. Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). As such, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). Interrogation is defined as "express questioning or its functional equivalent," which includes "words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

It is, however, well-settled that a defendant may waive the Miranda rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

### B. Analysis

Defendant does not identify which of the statements that he made during the January 27, 2016, that he seeks to suppress. Accordingly, the Court must necessarily address all of the statements Defendant made that day which appear in the present record. The statements that Defendant made on January 27, 2016, that appear in the record may be grouped into three categories: 1) the statements Defendant made in the interview room before he was read the Miranda warnings; 2) the statements that Defendant made between being read the Miranda warnings and when Investigator Tinsley terminated the interview; and 3) the statements that Defendant made after the interview had been terminated.

1. Pre-Miranda warning statements.

There is no dispute that Defendant was in custody at the time that the Investigators began by asking him basic identifying questions about himself, his address, and his phone number. Importantly, to be subject to suppression under Miranda, a statement made while in custody must be made in response to interrogation. United States v. McGlothen, 556 F.3d 698, 701 (8th Cir. 2009) (citing United States v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005)). However, officers asking routine questions seeking basic identifying information, *i.e.*, routine booking questions, about a defendant generally does not constitute interrogation for the purposes of Miranda. United States v. Ochoa-Gonzalez, 598 F.3d 1033, 1038 (8th Cir. 2010). Rather, an officer's routine booking questions will only be subject to suppression under Miranda if the asking officer "should reasonably be aware that the information sought . . . is directly relevant to the substantive offense charged[.]" United States v. Brown, 101 F.3d 1272, 1274 (8th Cir. 1996) (quoting United States v. McLaughlin, 777 F.2d 388, 391-92 (8th Cir. 1985)).

In the present case, the subject of Investigator Tinsley's initial booking type questions, *i.e.*, Defendant's height, weight, address, and phone number, are not directly relevant to the charge against Defendant of bank robbery. As such, Defendant's statements in response to those initial questions are not subject to suppression under Miranda.

Accordingly, the Court recommends **DENYING** Defendant's Motion to Suppress Statements, [Docket No. 23], to the extent that it pertains to the statements that Defendant made in response to the identifier questions Investigator Tinsley asked before he read Defendant the Miranda warnings.

2. Statements Post-<u>Miranda</u>.

As noted above, it is not disputed that Defendant was in custody during the interview. Nor is there any dispute that Defendant was read a complete <u>Miranda</u> warning, that Defendant said after the reading that he had understood "real well" those warnings, or that, when asked, Defendant indicated that he was willing to talk to the Investigators.

Nonetheless, Defendant initially contends that the manner in which Investigator Tinsley read the <u>Miranda</u> warnings to Defendant was not valid.

With regard to the adequacy of provided <u>Miranda</u> warnings, the U.S. Supreme Court has explained:

> The four warnings <u>Miranda</u> requires are invariable, but this Court has not dictated the words in which the essential information must be conveyed. See <u>California v. Prysock</u>, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981) (per curiam) ("This Court has never indicated that the rigidity of <u>Miranda</u> extends to the precise formulation of the warnings given a criminal defendant." (internal quotation marks omitted)); <u>Rhode Island v. Innis</u>, 446 U.S. 291, 297, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (safeguards against self-incrimination include "<u>Miranda</u> warnings ... or their equivalent"). In determining whether police officers adequately conveyed the four warnings, . . .[t]he inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by <u>Miranda</u>.'" <u>Duckworth[ v. Eagan</u>, 492 U.S. 195, 201 (1989)] (quoting <u>Prysock</u>, 453 U.S., at 361, 101 S.Ct. 2806).

<u>Florida v. Powell</u>, 559 U.S. 50, 60 (2010).

<u>Miranda</u> requires that a suspect subject to custodial interrogation must be advised prior to any questioning that:

> [1] he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

<u>Miranda</u>, 384 U.S. at 479. In addition, in <u>Duckworth</u>, the U.S. Supreme Court clarified that the right to the presence of an attorney referred to in <u>Miranda</u> requires that the suspect only be

informed "that he has the right to an attorney before and during questioning[.]" Id., 492 U.S. at 204.

Defendant does not argue that Investigator Tinsley's phrasing of the Miranda warnings was insufficient, only that the Investigators did not provide him with a written copy of the warnings to follow along during the reading; that Investigator Tinsley did not pause after reading each warning to ask him whether he understood that portion of the warning; and that the Investigators did not have him sign a form indicating in writing that he had waived his rights to remain silent and to have an attorney present. Which such measures might be evidence that assists the Government to establish the validity of defendant's waiver of his rights to remain silent and to have an attorney present, see, e.g., Berghuis v. Thompkins, 560 U.S. 370, 383 (2010) (provision of a written copy of the Miranda warnings weighed in favor of finding waiver valid); United States v. Tellez, 586 F. App'x 242, 244 (7th Cir. 2014) (officer pausing between reading each Miranda warning to confirm understanding of the warnings considered as part of concluding that waiver was valid); United States v. Gallardo, 495 F.3d 982, 991 (8th Cir. 2007) (signed waiver form weighed in favor of finding waiver valid), Miranda does not require the interrogating officers to provide a defendant with a written version of the warnings to follow along, nor that the interrogating officers pause between the reading of each warning to establish whether the suspect understood each individual waring, nor that the interrogating officers obtain a written waiver form. See, e.g., Duckworth, 492 U.S. at 203 ("The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by Miranda.'" (quoting Prysock, 453 U.S. at 355) (alterations in Duckworth)). In the present case, the undersigned concludes that Investigator Tinsley's reading of the Miranda warnings reasonably conveyed to Defendant his rights.

Defendant next contends that his waiver of his rights to remain silent and to have an attorney present during the interview was not valid.

The validity of a Miranda waiver requires consideration of two distinct inquiries, whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and whether the waiver was knowingly and intelligently made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

    a. Knowing and Intelligent

"As a general matter ... an accused who is admonished with the warnings prescribed by [the] Court in Miranda has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one[.]" United States v. Garlewicz, 493 F.3d 933, 936 (8th Cir. 2007). In the present case, Defendant was read the Miranda warnings in a form that the undersigned has already concluded reasonably conveyed the substance of his rights to him. In addition, Defendant expressly stated that he had understood those rights "very well." Accordingly, the Court concludes that Defendant's waiver of his rights to remain silent and to have an attorney present during the interview was knowingly and intelligently made.

    b. Voluntary

Defendant also contends that his waiver of his Miranda rights was not voluntarily made; arguing that it was the product of a coercive environment that began when he was arrested at Customer Link and that continued throughout the interrogation.

"Statements to law enforcement authorities are voluntary if they are the product of an essentially free and unconstrained choice by [their] maker." Vinton, 631 F.3d at 482 (internal quotation marks and citation omitted). "A statement is not considered involuntary unless 'the police extorted it from the accused by means of coercive activity.'" Id. (quoting Jenner v. Smith, 982 F.2d 329, 333 (8th Cir. 1993)).  Accordingly, "[a] statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (emphasis added). A court determines whether a statement was made involuntarily by examining the totality of the circumstances. Id. (citing Wilson v. Lawrence County, 260 F.3d 946, 952 (8th Cir. 2001)).

The record presently before the Court indicates that the interviewing officers did not threaten Defendant, did not use violence against him, nor did they make any express or implied promises of leniency to Defendant to obtain his statements. Defendant nevertheless asserts that a number of factors made the environment in which he was interviewed coercive, including: the presence of six officers in his workplace when he was arrested; the fact that Investigator Tinsley was still wearing his tactical vest when he first placed Defendant in the interview room; the length of the interview; the small and windowless character of the interview room; and that the Investigators remained armed throughout the interview.

The Court does not find persuasive Defendant's arguments. The fact that multiple officers arrested him and that Investigator Tinsley was wearing his tactical vest before the

interview commenced did not render the environment of the subsequent interview improperly coercive. To be subject to suppression under Miranda, statements must be made while a defendant is custody. Stansbury, 511 U.S. at 322. The determination whether an individual is in custody for the purposes of Miranda focuses on the circumstances as they existed at the time the challenged statements were being made. United States v. Brave Heart, 397 F.3d 1035, 1038 (8th Cir. 2005) (emphasis added). In addition, numerous courts have found an interrogation by two or more officers in an environment where there were also additional officers present not to be coercive. See, e.g., United States v. Havlik, 710 F.3d 818, 822 (8th Cir. 2013) (multiple officers on site while three of the officers interviewed defendant in his home not coercive); Simmons v. Bowersox, 235 F.3d 1124, 1127 (8th Cir. 2001) (multiple officers arresting juvenile and taking him be interviewed at police station by three officers not coercive). As such, the circumstances of Defendant's arrest and Investigator Tinsley's pre-interview apparel do not in this case render the circumstances of the interview now at issue coercive.

In addition, courts have found interviews that lasted longer than the approximately one-hour at issue here and interviews taking place in small windowless rooms not to be coercive. See, e.g., Simmons, 235 F.3d at 1133 (interview of juvenile lasting two hours not coercive); United States v. Ladoucer, No. CRIM 07-165 (ADM/JSM, 2007 WL 3375223, at *16 (D. Minn. Aug. 30, 2007) (interview in small, cell-like room not coercive), report and recommendation adopted in part, No. CRIM 07-1651 (ADM/JMS), 2007 WL 3051434 (D. Minn. Oct. 17, 2007).  Nor is the mere fact that the officers were armed throughout the interview sufficient to show coercive police activity. See, e.g., United States v. Axsom, 289 F.3d 496, 501 (8th Cir. 2002) (finding no deceptive or strong-arm tactics that would render questioning custodial even when nine armed

officers interviewed a defendant in his home, where the officers did not adopt threatening postures, display their weapons, or make physical shows of force during questioning).

Because there is no evidence in the record presently before the Court that the Investigators used coercive tactics either before or during the interview that overbore Defendant's will, Defendant's waiver of his rights to remain silent and to have an attorney present during the interview was voluntary.  Indeed, the fact that Defendant felt free to ultimately stop the interview and invoke his right to counsel at a later time of his choosing is evidence that Defendant's will was in fact <u>not</u> overborne.

Accordingly, the undersigned recommends **DENYING** Defendant's Motion to Suppress Statements, [Docket No. 23], to the extent that the motion pertains to the statements that he made between being read the <u>Miranda</u> warnings and later invoking his rights to remain silent and have counsel present.

3. Post-interview statements.

After the Investigators terminated the interview in response to Defendant's invocation of his rights to remain silent and to have counsel present, (Govt. Ex. 2 at 1:09:51-1:10:30), Defendant made a single statement in response to a subsequent question by Investigator Temple. Shortly after Investigator Tinsley had left the interview room to prepare transportation documents for Defendant, Investigator Temple showed Defendant an information sheet concerning Defendant that contained Defendant's photo and said, "That was a while ago, hunh?" Defendant responded, "Yup."

> The Supreme Court has explained:
>
> After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. [<u>Miranda</u>,] at 473–474, 86 S.Ct. 1602. Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. [<u>Miranda</u>,] at 474, 86 S.Ct. 1602.

Maryland v. Shatzer, 559 U.S. 98, 104 (2010).

Although Investigator Temple's question about the photograph does not on its face appear to be intended to obtain information about the January 25, 2016, robbery, it was a direct question to Defendant that was not aimed at obtaining any routine booking information. As such, Defendant's response to that question must be suppressed.

However, Defendant also made a series of statements and later asked Investigator Temple two questions. Those statements and questions were all made by Defendant spontaneously and not in response to any questioning or conduct by the Investigators. "Miranda does not bar the government from introducing into evidence spontaneous statements made during a conversation not initiated by the officer." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing United States v. Hawkins, 102 F.3d 973, 975 (8th Cir.1996), cert. denied, 520 U.S. 1179 (1997).

Accordingly, the undersigned recommends **GRANTING in part** and **DENYING in part**, Defendant's Motion to Suppress Statements, [Docket No. 23], as delineated above to the extent that the motion pertains to the statements that Defendant made after he invoked his rights to remain silent and to have counsel present and the Investigators terminated the interview.

### III. DEFENDANT'S MOTION TO SUPPRESS SEARCH AND SEIZURE. [Docket No. 24].

Defendant moves the Court to suppress physical evidence gathered as a result of the search of the content of his cell phone pursuant to a state court warrant. (See Def.'s Motion to Suppress Search and Seizure, [Docket No. 24]). At the hearing, Defendant stated that his challenge to the lawfulness of the search of his cell phone was limited to a "four corners" review of the application in support of the warrant to search the contents of his cell phone to determine whether the affidavit provided probable cause for the warrant to issue. (See Tr. 6). In his

subsequent brief in support of the motion, however, Defendant also offers an additional argument that the cellular phone was initially seized without a warrant and that the Leon good faith doctrine does not therefore apply to the facts of the present case. (Def.'s Memorandum in Support of Motion, [Docket No. 34], 2-6, 14-16).

In its brief in response to Defendant's Motion to Suppress Statements, the Government now affirmatively states that, since the May 10, 2016, motions hearing, it has decided that it will not offer any evidence that was obtained from the search of the content Defendant's cellular phone at trial. (Govt.'s Memorandum in Opposition to Motion, [Docket No. 36], 1 n.1).

When the Government represents it will not introduce the specific evidence that a defendant seeks to suppress through a pre-trial suppression motion, a court should deny the motion as moot as there is, in effect, no longer any evidence to be suppressed. See United States v. Brown, 584 F.2d 252, 255 (8th Cir. 1978) (internal quotations omitted) ("As evidence was not introduced as a result of these searches, there is nothing upon which the exclusionary rule can operate."); accord United States v. Hastings, No. CRIM. 11-25 (RHK/FLN), 2011 WL 2412829, at *12 (D. Minn. May 23, 2011) (recommending dismissal of suppression motion as moot where the Government stated that it did not intend to offer the challenged evidence at trial), report and recommendation adopted, No. CRIM.11-25 (1) RHK, 2011 WL 2393252 (D. Minn. June 13, 2011), aff'd, 685 F.3d 724 (8th Cir. 2012).

Accordingly, the undersigned recommends **DENYING** Defendant's Motion to Suppress Search and Seizure, [Docket No. 24], as moot.

IV. **CONCLUSION**

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Statements, [Docket No. 23], be **GRANTED in part** and **DENIED in part**, as discussed above; and,

2. Defendant's Motion to Suppress Search and Seizure, [Docket No. 24], be **DENIED** as moot.

Dated: June 2, 2016                                          s/Leo I. Brisbois
                                                             Leo I. Brisbois
                                                             U.S. MAGISTRATE JUDGE

# N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.